# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Stephen R. Olson, an individual; and
Amy J. Olson, an individual,

Civil No. 13-780 (DWF/JJK)

   Plaintiffs,

v.

**AMENDED
MEMORANDUM
OPINION AND ORDER**

Wells Fargo Bank, N.A., d/b/a America's
Servicing Company; and The Bank of New
York Mellon f/k/a The Bank of New York
as Successor in interest to JP Morgan Chase
Bank, N.A., as Trustee for Structured Asset
Mortgage Investments II, Inc., Bear Stearns
ALT-A Trust 2005-8, Mortgage
Pass-Through Certificates, Series 2005-8,

   Defendants.

_____

Christopher M. Daniels, Esq., Jesse H. Kibort, Esq., Troy A. Stark, Esq., and
Dominic J. Haik, Esq., Daniels & Kibort, PLLC, counsel for Plaintiffs.

D. Charles Macdonald, Esq., Erin L. Hoffman, Esq., and Jessica Z. Savran, Esq., Faegre
Baker Daniels LLP, counsel for Defendants.
_____


## INTRODUCTION

The following Order has been amended solely to reflect the correct attorneys

representing the parties.  This matter is before the Court on a Motion to Enforce

Settlement Agreement brought by Plaintiffs Stephen R. Olson and Amy J. Olson

(together, "Plaintiffs") (Doc. No. 40) and a Motion for Summary Judgment brought by

Wells Fargo Bank, N.A., d/b/a  America's Servicing Company ("Wells Fargo"), and The

Bank of New York Mellon, f/k/a The Bank of New York as Successor in interest to JP Morgan Chase Bank, N.A., as Trustee for Structured Asset Mortgage Investments II, Inc., Bear Stearns ALT-A Trust 2005-8, Mortgage Pass-Through Certificates, Series 2005-8 (the "Bank of New York") (collectively, "Defendants"). (Doc. No. 51.) For the reasons set forth below, the Court denies Plaintiffs' Motion to Enforce Settlement Agreement and grants Defendants' Motion for Summary Judgment.

## BACKGROUND

In July 2005, Plaintiffs borrowed $359,650 from Union Federal Bank of Indianapolis and purchased property in Ramsey, Minnesota (the "Property"). (Doc. No. 59, Ex. 1 ("Banks' App.") at 1-8.) The loan was secured by a Mortgage in favor of Union Federal Bank of Indianapolis. (*Id*. at 9-28.) In 2006, Wells Fargo began servicing the loan. In April 2009, the loan was assigned to the Bank of New York and the assignment was recorded on July 1, 2009. (*Id*. at 29-31.)

Plaintiffs fell behind on their loan payments. (*Id*. at 32-37; Doc. No. 1 ("Verified Compl.") ¶ 10.) Plaintiffs contacted Wells Fargo to attempt to permanently modify their loan. (Verified Compl. ¶ 11.) Plaintiffs applied for a loan modification, but their application was denied because Plaintiffs were unable to afford the modified payments. (Banks' App. at 39.) Plaintiffs' attorney later informed Wells Fargo that Plaintiffs' financial situation had improved and requested that Wells Fargo reconsider Plaintiffs' loan modification application. (*Id*. at 38.) From June through August 2010, Wells Fargo and Plaintiffs communicated with respect to Plaintiffs' loan modification application. (*Id*. at 38-67.)

On June 2, 2010, Plaintiffs received a letter from Wells Fargo, stating in part, the following:

> As your mortgage servicer, we want to help you stay in your home. We want you to know there is a program available that may help you. If you qualify under the federal government's Home Affordable Modification program and comply with the terms of the Home Affordable Modification Program ["HAMP"] Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure.

(Doc. No. 61 ("Haik Aff.") ¶ 1, Ex. 1.) Plaintiffs were asked to gather and submit certain financial documentation and to complete required forms. (*Id.*) The letter stated: "If you meet the eligibility criteria, you will be offered a Trial Period Plan." (*Id.*)

On August 25, 2010, Wells Fargo informed Plaintiffs that they had been "approved to enter into a trial period plan under the Home Affordable Modification Program" (the "TPP Letter"). (Banks' App. at 80.)

The TPP Letter reads, in relevant part, as follows:

> **Congratulations!** You are approved to enter into a trial period plan under the Home Affordable Modification Program. This is the first step toward qualifying for more affordable mortgage payments. Please read this letter so that you understand all the steps you need to take to modify your mortgage payments.
>
> **What you need to do . . .**
> To accept this offer, you must make new monthly "trial period payments" in place of your normal monthly mortgage payment. <u>Send your monthly trial period payments—instead of your normal monthly mortgage payment—as follows:</u>
>
> > 1st payment: $1,714.36 by October 1, 2010
> > 2nd payment: $1,714.36 by November 1, 2010
> > 3rd payment: $1,714.36 by December 1, 2010
>
> After all trial period payments are timely made and you have submitted all the required documents, your mortgage would then be permanently

modified. (Your existing loan and loan requirements remain in effect and unchanged during the trial period.) **If each payment is not received by [Wells Fargo] in the month in which it is due, this offer will end and your loan will not be modified under the Making Home Affordable program**.

. . .

**Why is there a trial period?**
The trial period offers you immediate payment relief (and could prevent a foreclosure sale) while we process your paperwork to determine if you qualify for a permanent loan modification. It also gives you time to make sure you can manage the lower monthly mortgage payment. Note: This is only a temporary Trial Period Plan. Your existing loan and loan requirements remain in effect and unchanged during the trial period.

. . .

**Your current loan documents remain in effect; however, you may make the trial period payment instead of the payment required under your loan documents:**
You agree that all terms and provisions of your current mortgage note and mortgage security instrument remain in full force and effect and you will comply with those terms; and that nothing in the trial period plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents.

(*Id.* at 80, 82, 84.)

Plaintiffs made the trial payments as outlined on a monthly basis. Plaintiffs contend that they successfully completed all requirements under the TPP Letter by December 1, 2010, and should have been offered a permanent loan modification. In January 2011, Plaintiffs contacted Wells Fargo and asked Wells Fargo to confirm that Plaintiffs would receive a permanent loan modification. Wells Fargo indicated that the permanent loan modification was in "the final steps to go through settlement." (*Id.* at 57.) In February 2011, Plaintiffs called Wells Fargo again and were told that their

application was still in review for a final modification and that Wells Fargo was waiting to hear from the investor. (*Id*.) Plaintiffs made TTP payments through October 2011.

During the loan modification review, Wells Fargo discovered tax liens and judgments recorded against the Property. (*Id*. at 63, 66, 100-03, 132-33.) In early August 2011, Wells Fargo was informed that Plaintiffs would be filing for bankruptcy. (*Id*. at 66.) In a letter dated November 14, 2011, Wells Fargo indicated that in order to proceed with Plaintiffs' HAMP modification process, it required documented proof within ten days that the title issues had been resolved, including the subordination of their second mortgage. (*Id*. at 87.) Plaintiffs sought more time to provide the documentation. (*Id*. at 68-71.) On January 6, 2012, Wells Fargo agreed to provide more time, but reiterated the need for a subordination agreement and proof of clean title. (*Id*. at 71.) Wells Fargo subsequently communicated with Plaintiffs' attorney, reiterating the need for a subordination agreement. (*Id*. at 76.) On March 23, 2012, Wells Fargo again wrote to Plaintiffs, via their attorney, stating that a loan modification was not possible because Wells Fargo did not receive the necessary documentation. (*Id*. at 79.)

Wells Fargo initiated foreclosure proceedings as the attorney-in-fact for The Bank of New York Mellon. (*Id*. at 90-130.) On or about December 31, 2012, Defendants served Plaintiffs with a Notice of Mortgage Foreclosure Sale. (*Id*. at 104-06.) A Sheriff's sale occurred on March 1, 2013. (*Id*. at 115-17.)

Plaintiffs initiated the present action in state court in March 2013. (Verified Compl.) Defendants removed the case to this Court. (Doc. No. 1.) In their Complaint, Plaintiffs assert claims for Breach of Contract (Count I); Negligent and Constructive

Misrepresentation (Count II); Breach of the Covenant of Good Faith and Fair Dealing (Count III); Promissory Estoppel (Count IV); Slander of Credit (Count V); Violation of Minn. Stat. § 580.02 (Count VI); Violation of Minn. Stat. § 580.04 (Count VII); and Slander of Title (Count VIII). (Verified Compl. ¶¶ 49-146.)

Beginning in May 2013, the parties engaged in discussions regarding the settlement of this case that continued for nearly eighteen months. (Doc. No. 47 ("Savran Decl.") ¶¶ 2-3 & Ex. A at 4-6.) Specifically, the parties' attorneys discussed a possible settlement that involved Plaintiffs' submitting a loan modification application. (*Id*. ¶ 2.) Plaintiffs provided financial information to Wells Fargo "in the hopes of coming to an amicable resolution" of the matter. (*Id*. ¶ 3, Ex. A at 4.) At that time, Wells Fargo's attorney told Plaintiffs' attorney that tax liens recorded against the Property would likely be a problem with respect to Plaintiffs' loan modification application. (*Id*. at 3.) Wells Fargo's attorney explained:

> Unfortunately, Wells Fargo tells me that any kind of judgment lien on the property that clouds title disqualifies a person from getting a loan modification. It is irrelevant that they are participating in a payment plan; so long as there is a lien on the property, they cannot get a [modification]. All of the information I have so far tells me that the liens on the [Plaintiffs'] property is why they did not qualify for a [modification] in 2011. Unless they can come up with a way to quickly pay it off, Wells Fargo will not consider them for a modification. I'm really sorry.

(*Id*.) Wells Fargo did not review Plaintiffs' financial information further because of the unresolved tax liens. (Savran Decl. ¶ 4.) Wells Fargo submits that all subsequent settlement negotiations took "place with the understanding that [Plaintiffs] needed to resolve the liens before they could . . . qualify for a modification." (*Id*. ¶ 5.)

On May 28, 2013, Plaintiffs' attorney informed Wells Fargo's attorney that Plaintiffs were able to obtain subordinations for the tax liens. (*Id*. ¶ 6.) Plaintiffs' attorney asked whether that would satisfy Wells Fargo so as to consider Plaintiffs for a modification. (*Id*. ¶ 3, Ex. A at 2.) Wells Fargo agreed to review a loan modification application "under the assumption" that Plaintiffs would secure subordination agreements. (*Id*. ¶ 7, Ex. B.) Plaintiffs' attorney understood this. (*Id*. ¶ 8, Ex. C at 1.) Wells Fargo also indicated that ultimate approval would depend *in part* on the subordination agreements. (*Id*. ¶ 7, Ex. B (emphasis added).) Plaintiffs' attorney, however, also acknowledged that his clients were having problems obtaining the necessary subordinations and proposed, instead, that Plaintiffs purchase a lender's title policy insuring Wells Fargo in a first-lien position. (*Id*. ¶ 8, Ex. C at 2.)

On August 9, 2013, Plaintiffs' attorney e-mailed Wells Fargo's attorney to inquire into the status of Plaintiff's loan modification application. (*Id*. ¶ 10, Ex. D.) Wells Fargo indicated that it had not yet reached a decision. (*Id*.) On August 19, 2013, Wells Fargo's attorney e-mailed Plaintiffs' attorney requesting additional information regarding Plaintiffs' income. (*Id*. ¶ 11, Ex. E at 1-2.) Plaintiffs' attorney provided the information and asked whether Plaintiffs could begin making trial payments again. (*Id*. ¶ 12, Ex. F at 1-2.) Counsel for Wells Fargo stated: "I think all of this will depend on whether [Plaintiffs] are approved for a loan modification." (*Id*. at 1.)

The parties did not communicate again until October 1, 2013, when counsel for Wells Fargo asked for an update on the subordinations. (*Id*. ¶ 13, Ex. G at 2.) Plaintiffs'

counsel indicated that Plaintiffs might not be able to obtain a subordination from the State of Minnesota, but indicated that he was pursuing the matter further. (*Id*. at 1.)

On October 30, 2013, Plaintiffs' attorney e-mailed Wells Fargo's attorney, indicating that a title insurance company was willing to insure a modified mortgage in first-lien position. (*Id*. ¶ 15, Ex. H at 4.) In the same e-mail, Plaintiffs' attorney purported to make a settlement offer containing the following terms: Plaintiffs would pay the title insurance premium and closing fees for a new lender's title insurance policy insuring Plaintiffs' modified mortgage loan in the first lien position; Plaintiffs would discharge the Notice of Lis Pendens recorded against the Property; the parties would stipulate to an order voiding the foreclosure sale; and the parties would record a modification of Plaintiffs' Mortgage Loan with fixed payments in the same amount as those paid by Plaintiffs during the trial period. (Doc. No. 43 ("Hartmann Aff.") ¶ 2, Ex. A at 1.) Specifically, the e-mail from Plaintiffs' attorney states:

> We have good news. The title insurance company that insures title on your client's mortgage . . . indicated that it is willing to insure your client's modified mortgage in first position. The title company will put its money on the line without the subordinations.
>
> I told the examiner that we anticipate the modified interest rate will be fixed and will be lower than the original interest rate. I also said that the anticipated monthly payment will be the same as the TPP payment . . . .
>
> As I told the examiner, every junior interest will be more secure because the likelihood of default on the first mortgage will be reduced—in fact, a fatal default [the Sheriff's Certificate] will be cured and the junior interests will be restored in the same relative position *vis a vis* your client. In other words, the junior lienholders would have no basis for a judicial subordination because they currently have no interest of record, and any revived interest they might have will necessarily be subordinate to the

modification agreement that revived them. These are basic equitable principles.

I proposed to the examiner that we will discharge the lis pendens, obtain an order voiding the foreclosure sale (by stipulation), and record a modification of your client's first mortgage. I asked the examiner (who in turn asked the underwriter) the following question: What would it take to insure the bank's modified mortgage in first position?

The response was, "if the mortgage has a clause about securing renewals, extensions, [and] modifications, they won't require anything further from the junior mortgage holder." The mortgage does secure "all renewals, extensions, and modifications of the Note . . . ."

. . .

My clients will pay the title insurance premium and related fees from the title company. This will put your client in the same position it was originally in: it will be insured in first-lien position.

**What will your client require in order to move forward with the modification?** You mentioned a new trial payment plan. Can we start with that? **Please let me know your client's terms.** This matter is ripe for settlement. If your client has any particular concerns, please address them with me.

(*Id*. at 1 (emphasis added).)

Plaintiffs' attorney subsequently sent follow-up e-mails on November 19, 2013 and December 3, 2013, respectively, stating in part:

Have you heard a response from your client regarding Steve and Amy Olson's offer to insure your client's modified mortgage loan in first position? This is a win-win. Please let me know if your client has any hesitation or questions. We want to make it very easy for your client to say "yes." Conversely, we see no good faith reason for your client to deny the modification.

. . .

Why is your client taking so long to make this decision? Our proposal will insure your client's mortgage in first position and our clients will resume

making payments as they did for 13 months pursuant to the trial payment plan (until your client indicated it was initiating foreclosure proceedings) . . . [Plaintiffs] have offered to pay your client's title insurance premium in order to resolve this matter. Does your client need some additional information to help make this decision?

(Hartmann Aff. ¶¶ 3-4, Exs. B-C.)

On December 4, 2013, Wells Fargo's attorney sent Plaintiffs' attorney an e-mail that stated in part:

> I contacted Wells Fargo again to see if a decision has been made about whether it will accept the proposed arrangement. I can tell you that if they agree to this type of arrangement, we will need to see a copy of the insurance commitment for our review and approval. At this point, however, I still have not heard if Wells will approve this or not. I know it is taking a long time.

(*Id.* ¶ 5, Ex. D.)

On December 19, 2013, Wells Fargo's attorney sent another e-mail to Plaintiffs' attorney, which stated in part:

> Wells *finally* got back to me and said it would accept an insurance policy insuring their lien position. So, the next step is to get me a copy of the [lender's title insurance policy] commitment so that we can review the precise language to make sure it is adequate. This is great news. I'm sorry it took so long.

(*Id.* ¶ 6, Ex. E.) On December 30, 2013, Plaintiffs' attorney sent a copy of the updated lender's title insurance policy to Wells Fargo's attorney. (*Id.* ¶ 8, Ex. F.) Wells Fargo's attorney responded the next day, stating: "We will review this and get back to you on whether it is sufficient." (*Id.* ¶ 9, Ex. G.) On January 7, 2014, Wells Fargo's attorney sent Plaintiffs' attorney an e-mail stating: "I wanted to follow up with you on this case.

We did not discuss what we should do with our respective outstanding discovery requests since we have reached an agreement in principle to settle?" (*Id.* ¶ 10, Ex. H.)

On January 13, 2014, Wells Fargo's attorney e-mailed Plaintiffs' attorney, stating in part: "[A] transactional attorney from my firm will be contacting the title company about our proposed changes to the title policy commitment . . . . Also, I will be drafting up a settlement agreement for this case and will pass it along to you for your review once I have drafted it." (*Id.* ¶ 11, Ex. I.)  On that same day, a real estate attorney, whose assistance had been enlisted by his colleague and counsel for Wells Fargo, e-mailed the title examiner at Edina Realty Title, requesting a lender's title insurance policy commitment and a lender's pro forma policy.  (*Id.* ¶ 12, Ex. J.)  The e-mail also stated, in part:

> As I understand it, the lender and the borrower have entered into a settlement agreement pursuant to which the mortgage is re-instated, and a lender's title insurance policy (specifically insuring that the mortgage continues to have priority over certain liens against the property owner) is purchased.

(*Id.*)[1]  The e-mail was copied to Wells Fargo's attorneys on this matter.  (*Id.*)  Plaintiffs claim that those attorneys did not (either directly or through their new counsel) disaffirm that a settlement had been reached.  (*Id.* ¶ 16.)

On January 30, 2014, an attorney for Wells Fargo e-mailed Plaintiffs' attorney, attaching a document in which she attempted to reduce the Settlement Terms to a "four

---

[1]  Plaintiffs point to this e-mail as evidence that the parties had reached an agreement.  Defendants have submitted evidence that the real estate attorney who drafted this e-mail had not been involved in the litigation or settlement discussions and was involved solely to obtain a commitment for a lender's title insurance policy.  (Doc. No. 48 ("Moe Aff.") ¶¶ 2-5.)

corners" document. (Savran Decl. ¶ 23.) The draft agreement provides in part as follows:

> Wells Fargo agrees to review [Plaintiffs'] for a loan modification. [Plaintiffs] agree to provide Wells Fargo with a complete and up-to-date loan modification application within a reasonable amount of time after execution of this Agreement. . . .
>
> . . .
>
> [Plaintiffs] agree and acknowledge that this Agreement requires only that Wells Fargo review the [Plaintiffs] for a loan modification, and does not commit Wells Fargo to approving, offering or granting [Plaintiffs] a loan modification. . . .

(*Id.* ¶ 24, Ex. M at 2-3.)

Plaintiffs submit that the draft agreement differed from the terms negotiated by counsel and that Defendants attempted to add additional and new terms to the agreement. Plaintiffs objected to Wells Fargo's settlement terms in an e-mail dated February 5, 2014:

> The draft settlement agreement terms are very surprising to us. We expected the agreement to include [Plaintiffs'] modified loan terms and the proposed modification documents. The draft agreement only requires Wells Fargo to review [Plaintiffs] for a modification.

(Hartman Aff. ¶ 21, Ex. L at 1.) Wells Fargo's attorney responded to the e-mail:

> [Plaintiffs] have to actually qualify for a loan modification in order to get a loan modification. They will need to resubmit a loan modification package since it has to be up-to-date with their most recent bank statements and evidence of pay/paystubs []. Wells can't agree to modify their loan without conducting a full review to determine if they qualify for a loan. This is what we discussed long ago.

(*Id.* ¶ 22, Ex. L at 1.)

On March 13, 2014, Plaintiffs' attorney informed Wells Fargo's attorney that:

> We are working with [Plaintiffs] to prepare an updated modification application. I had intended to send you redlines to the proposed settlement agreement that added some protection for [Plaintiffs] during the modification review period, among other things. . . .

(Savran Decl. ¶ 27, Ex. N at 1.) Wells Fargo's attorney responded by indicating that Wells Fargo would not review a modification application without a settlement agreement in place. (*Id.*)

On April 8, 2014, Plaintiffs' attorney sent an e-mail to Wells Fargo's attorney, stating in relevant part:

> Based on the substantial written correspondence about our settlement proposal which I explain in part below, our position is that we have a settlement agreement to reinstate the previous modified mortgage in exchange for the [Plaintiffs] providing a lender's title policy insuring the modified loan in the first position.
>
> . . .
>
> I am prepared to revise the draft settlement agreement to include the terms of our agreement, which was to reinstate the previously modified mortgage loan in exchange for a lender's title policy insuring your client in first position.

(*Id.* ¶ 28, Ex. O at 3.)

On April 9, 2014, counsel for Wells Fargo responded:

> It appears that, perhaps, there has been a misunderstanding. Settlement discussions started by your firm asking if Wells Fargo would consider [Plaintiffs] for a modification. I thought it was clear to you that Wells Fargo cannot just modify your clients' loan. The only way to obtain a modification is to submit a current modification application, which gets reviewed by Wells Fargo. Any application that is more than 90 days old is outdated and will not be considered. The reason for this is that Wells Fargo needs to review current financial information in order to make a decision about a modification. [Plaintiffs'] financial situation from 6 or 8 months ago could paint a very different picture than their financial situation today.

Wells Fargo agreed to review [Plaintiffs] for a modification if [Plaintiffs] could obtain assurance that Wells Fargo would remain in a first lien position. For many months you worked on obtaining subordination agreements. When that turned out to be a dead-end road, we went a different route—a title commitment insuring Wells Fargo's first lien position.

From my understanding, [Plaintiffs] literally cannot purchase the title commitment until we know the terms of the modified loan. Attorneys at our office worked on the language of the title commitment, and so we're now at the stage of signing a settlement agreement. I have never heard of a settlement agreement that left the litigation intact. A settlement, from my understanding, is a way to resolve and end the litigation. That is what we are trying to accomplish here.

***

So, in an effort to move the process forward, is the dismissal with prejudice the part you cannot accept? That is the only feedback I have received from you, and I am prepared to take feedback to Wells Fargo, but I need to know what that feedback is.

(*Id.* at 1-2.)

On September 12, 2014, Defendants' attorney indicated that Wells Fargo would request the writ of recovery (to complete the eviction of Plaintiffs from the Property) on or after October 1, 2014. (Hartman Aff. ¶ 25, Ex. O.)

## DISCUSSION

### I. Motion to Enforce Settlement Agreement

Plaintiffs move to enforce the purported settlement of their claims. In support, Plaintiffs argue that their attorney made a settlement offer via e-mail to Wells Fargo's counsel on October 30, 2013 (the "October 30 e-mail") and that the offer proposed terms, including that the parties would record a modification of Plaintiffs' Mortgage Loan with fixed payments in the same amount as those paid during the TPP. Plaintiffs also argue

that Defendants accepted Plaintiffs' offer to purchase a lender's title policy, Defendants had already approved Plaintiffs for a loan modification in August 2010, and that once the alleged issue with Plaintiffs' title was eliminated, there were no unmet conditions to obstruct Plaintiffs' loan modification.

Defendants argue that the parties did not enter into a settlement agreement. Specifically, Defendants contend that there was no clear and definite offer, Wells Fargo never accepted any proposal to modify Plaintiffs' mortgage loan without review, and no settlement agreement exists because there was no meeting of the minds on essential terms of a settlement. In so arguing, Defendants acknowledge that there were ongoing settlement discussions, but maintain that any settlement agreement was conditioned on a loan modification review.

Settlement of lawsuits without litigation is highly favored, and such settlements will not be set aside lightly. *Johnson v. St. Paul Ins. Cos*., 305 N.W.2d 571, 573 (Minn. 1981) (considering a motion to vacate settlement agreement). If a settlement unravels before the original suit is dismissed, a party who seeks to keep the settlement may file a motion for enforcement because a district court possesses the inherent or equitable power to enforce an agreement to settle a case pending before it. *Simmons, Inc. v. Koronis Parts, Inc.*, Civ. No. 00-1984, 2002 WL 1347401, at *2 (D. Minn. June 18, 2002). However, before enforcing a settlement, the Court must first conclude that a settlement agreement was actually reached.

Under Minnesota law, it is well established that settlement agreements are governed by principles of contract law. *Ryan v. Ryan*, 193 N.W.2d 295, 297 (Minn.

1971). "[A] full and enforceable settlement requires offer and acceptance so as to constitute a meeting of minds on the essential terms of the agreement." *Id.* "[W]here the offer is clear, definite, and explicit, and leaves nothing open for negotiation, it constitutes an offer, the acceptance of which will complete the contract." *Short v. Sun Newspapers, Inc.*, 300 N.W.2d 781, 786 (Minn. 1980) (citation omitted).

The parties dispute whether they agreed to settle this case pursuant to the terms set forth in the October 30 e-mail. After a careful review of the record, and for the reasons discussed below, the Court concludes that the parties did not enter into an agreement to settle this matter pursuant to the terms purportedly set forth in the October 30 e-mail.

First, the formation of a contract requires communication of a specific and definite offer. *See Grenier v. Air Express Int'l Corp.*, 132 F. Supp. 2d 1198, 1201 (D. Minn. 2001); *Wells v. Envoy Med., Inc.*, Civ. No. 11-1572, 2012 WL 4009435, at *3 (D. Minn. Sept. 12, 2012). Here, Plaintiffs contend that the October 30 e-mail constitutes an offer. The Court disagrees. As an initial matter, the terms identified in the e-mail (that Plaintiffs now contend constitute the terms of an offer) were not proposed to Wells Fargo. Instead, in the e-mail, Plaintiffs' attorney explains what he communicated to the title examiner: "I also said [to the title examiner] that the anticipated monthly payment will be the same as the TPP payment" and "I proposed to the examiner that we will discharge the lis pendens, obtain an order voiding the foreclosure sale (by stipulation), and record a modification of your client's first mortgage." (Hartman Aff. ¶ 12, Ex. A.) This language, when viewed objectively, is not a proposal of specific

settlement terms to Wells Fargo, but is rather an ongoing discussion of possible settlement terms.

Second, even if the purported terms were directed to Wells Fargo, the e-mail is not sufficiently definite to be considered an offer. In fact, Plaintiffs' attorney specifically asked: "What will your client require in order to move forward with the modification? You mentioned a new trial payment plan. Can we start with that? Please let me know your client's terms." (*Id.*) These questions highlight the fact that material terms remained open to negotiation and, thus, this e-mail reflects an offer to continue the ongoing negotiations. *See, e.g.*, *Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1026, 1030 (D. Minn. 2003) (explaining that the terms of a letter were not sufficiently clear and definite to constitute an offer; instead, the letter was an invitation to the opposing party to offer to settle).

Third, even if Plaintiffs' October 30 e-mail constituted an offer, Wells Fargo's counsel did not accept the offer. Acceptance of an offer must be coextensive with the offer and may not introduce additional terms. *See Alpine Glass, Inc. v. Ill. Farmers Ins. Co.*, 643 F.3d 659, 666 (8th Cir. 2011); *McLaughlin v. Heikkila*, 697 N.W.2d 231, 235 (Minn. 2005). Here, Plaintiffs claim that Wells Fargo accepted the terms set forth in the October 30 e-mail on December 19, 2013 (the "December 19 e-mail"), when Wells Fargo's attorney e-mailed the following:

> Wells *finally* got back to me and said it would accept an insurance policy insuring their lien position. So, the next step is to get me a copy of the [lender's title insurance policy] commitment so that we can review the precise language to make sure it is adequate. This is great news. I'm sorry it took so long.

(Hartman Aff. ¶ 6, Ex. E.)  Plaintiffs assert that the only contingency expressed was that Defendants would need a copy of the lender's title insurance policy commitment for review and approval.  The Court disagrees.  The December 19 e-mail only addresses one of the four alleged terms of Plaintiffs' settlement offer.  Thus, while Wells Fargo agreed to accept an insurance policy to insure its lien position, so long as the insurance policy was deemed adequate after review, the e-mail does not address any of the other purported settlement terms.  The December 19 e-mail, in addressing only Wells Fargo's willingness to accept a title policy in lieu of subordinations, is consistent with the parties' preceding settlement negotiations, which centered on whether Plaintiffs would be able to obtain subordinations from the Property's lien holders.  Because the December 19 e-mail is not "coextensive" with the purported settlement terms, it does not constitute an acceptance and no binding settlement was agreed upon.

Finally, upon careful review of the record and the parties' negotiations, it is apparent to the Court that there was not a meeting of the minds as to the essential terms of a settlement.  Significantly, the parties discussed the understanding that Plaintiffs would need to submit a modification application, which Wells Fargo would review under the assumption that Plaintiffs would secure subordinations.  It was apparent that approval for modification would depend in part on the securing of the subordinations.  The October 30 e-mail laid out a new strategy for settling the case—having Plaintiffs obtain an insurance policy insuring Wells Fargo's first lien position instead of obtaining subordinations.  There is no evidence that the parties agreed that Plaintiffs would get a

modification without review and approval.  Eventually, Wells Fargo did agree to "accept an insurance policy insuring their lien position," but it did not agree to modify Plaintiffs' loan without review.

Plaintiffs further attempt to rely on Wells Fargo's counsel's statement on January 7, 2014, that the parties had "reached a settlement in principle."  This statement alone, however, does not demonstrate that there was a meeting of the minds on the essential terms of a settlement agreement.  Wells Fargo reiterated the need for Plaintiffs to qualify for a loan modification.  (Savran Decl. ¶ 22, Ex. L.)  In fact, the evidence of the parties' negotiations indicates that the details were not agreed upon and, indeed, that the parties continued to negotiate for months.

For all of the above reasons, the Court concludes that the parties never came to a meeting of the minds on the essential terms of a settlement agreement.  Accordingly, Plaintiffs' motion to enforce settlement is denied.[2]

## II.    Summary Judgment

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural

---

[2]     The Court's ruling on this motion does not in any way condone what appears to be a serious lack of urgency on the part of Wells Fargo in responding to Plaintiffs in an attempt to settle this matter.

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## A. Breach of Contract (Count I)

Plaintiffs assert that the parties entered into a "TPP Agreement"— namely a binding, unilateral contract whereby Defendants were required to offer Plaintiffs a mortgage modification if Plaintiffs fulfilled all conditions precedent, such as making timely TPP payments and submitting required documents.[3] Plaintiffs further allege that

---

[3]     In their Verified Complaint, Plaintiffs allege that: (1) the TPP Letter "was an agreement to modify Plaintiffs' Loan"; (2) that Defendants "agreed, in writing, to modify Plaintiffs' loan"; and (3) that the "promises, representations and agreements between Plaintiffs and Defendants are valid and enforceable contracts." (Verified Compl. ¶¶ 17, 51-52.) Plaintiffs do not allege, however, a contract in which they would be *offered* a loan modification. Thus, the allegations in their Verified Complaint are inconsistent with Plaintiffs' current arguments. Even so, as explained herein, Plaintiffs' breach of contract claim fails as a matter of law.

they fulfilled all of the conditions precedent and, therefore, Defendants breached the agreement by failing to offer Plaintiffs a mortgage modification.

Defendants argue that Plaintiffs' breach of contract claim fails as a matter of law. Specifically, Defendants maintain that the TPP is not a contract for a permanent modification and that no contract to permanently modify (or offer to modify) Plaintiffs' loan was ever formed. In addition, Defendants argue that the TPP Letter cannot form the basis for a breach of contract claim because it does not qualify as a credit agreement under Minnesota law.

The elements of a breach of contract claim under Minnesota law are: (1) formation of a contract; (2) performance of conditions precedent by plaintiff; and (3) breach of the contract by defendant. *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014); *see also Olivares v. ONC Bank, N.A.*, Civ. No. 11-1626, 2011 WL 4860167 at *5 (D. Minn. Oct. 13, 2011). A valid contract contains the elements of "offer, acceptance, and bargained for consideration." *Topchain v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 850 (8th Cir. 2014). Minnesota law also imposes heightened writing requirements on home loan modifications. Minn. Stat. § 513.33, subd. 2. Specifically, Minnesota's Credit Agreement Statute bars the enforcement of "credit agreements" that are not in writing and signed by both the creditor and the debtor. *Id.* ("A debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor."). Moreover, a loan modification constitutes a credit agreement. *Racutt v. U.S. Bank*, Civ. No. 11-2948, 2012 WL 1242320, at *2 (D.

Minn. Feb. 23, 2012); *Tharaldson v. Ocwen Loan Servicing, LLC*, 840 F. Supp. 2d 1156, 1162 (D. Minn. 2011).

Here, Plaintiffs' breach of contract claim fails. First, no binding contract for a permanent modification was formed between the parties. The TPP Letter does not constitute a specific and definite offer to modify Plaintiffs' loan. *See, e.g.*, *Stark v. Bank of Am., N.A.*, Civ. No. 14-2913, 2015 WL 756938, at *2 (D. Minn. Feb. 23, 2015) (noting that even if the TPP was sufficient to create a unilateral contract, "it still fails under Minnesota law because it is silent on material terms"); *Bonhoff v. Wells Fargo Bank, N.A.*, 853 F. Supp. 2d 849, 857 (D. Minn. 2012) (holding a TPP is not a contract to modify a Note; but rather, it is an offer to consider modification); *Laurent v. Mortg. Elec. Registration Sys., Inc.*, Civ. No. 11-2585, 2011 WL 6888800, at *2 (D. Minn. Dec. 30, 2011) (dismissing breach of contract claim where letter does not express the requisite relevant terms for a loan modification); *Wittkowski v. PNC Mortg.*, Civ. No. 11-1602, 2011 WL 5838517, at *3-4 (D. Minn. Nov. 18, 2011) (providing that a TPP is not a promise of a permanent loan modification; in addition TPP does not set forth all relevant terms). Indeed, the TTP Letter specifically and explicitly provides that a modification is not guaranteed, stating for example: (1) "This is the first step toward qualifying for more affordable mortgage payments."; (2) "The trial period offers you immediate payment relief . . . while we process your paperwork *to determine if you qualify for a permanent loan modification*."; (3) "Note: This is only a temporary Trial Period Plan. Your existing loan and loan requirements remain in effect and unchanged during the trial period."; (4) "Once we confirm you are eligible for a Home Affordable

22

Modification and you make all of your trial period payments on time, we will send you a modification agreement . . ."; and (5) "You agree that all terms and provisions of your current mortgage note and mortgage security instrument remain in full force and effect and you will comply with those terms; and that nothing in this trial period plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents." (Banks' App. at 80, 82, 84 (emphasis added).)[4] Pursuant to the TPP Letter, Plaintiffs were not promised a permanent loan modification or that they would be *offered* a permanent loan modification.

Second, even accepting that Plaintiffs' breach of contract claim is based on the alleged existence of a binding unilateral contract, the claim also fails because there is no written agreement between the parties that would satisfy the heightened requirements for home loan modifications. The TTP Letter does not contain all relevant terms and conditions of a modified loan and is not signed by both the creditor and debtor. Therefore, it does not qualify as a credit agreement and no contract to modify the loan was formed. *See Stark*, 2015 WL 756938, at *2; *Wittkowski*, 2011 WL 5838517, at *3-4.

For the above reasons, Plaintiffs' breach of contract claim fails as a matter of law. In addition, the Court notes that while it need not consider Defendants' additional

---

[4] Despite the fact that their Verified Complaint specifically identifies the August 25, 2010 TPP Letter as the source of Defendants' offer, in their opposition, Plaintiffs cite to the June 2, 2010 Letter, wherein Wells Fargo invited Plaintiffs to participate in a TPP, as the source of the alleged modification offer. This letter, however, specifically provides that it is an invitation to *apply* for a TPP, not a loan modification. Indeed, the June 2 letter states: "If you meet the eligibility criteria, you will be offered a Trial Period Plan," *not* a permanently modified loan. Thus this letter does not support Plaintiffs' present breach of contract theory.

arguments in support of summary judgment on this claim, the record demonstrates that Plaintiffs failed to provide proof of clean title or a subordination agreement before Wells Fargo closed its file and therefore did not perform the required conditions for a loan modification.

### B. Negligent Misrepresentation (Count II)

In Count II of the Verified Complaint, Plaintiffs assert a claim for negligent misrepresentation.  (Verified Compl. ¶¶ 69-89.)

A person makes a negligent misrepresentation when:  "(1) in the course of his or her business, profession, or employment, or in a transaction in which he or she has a pecuniary interest, (2) the person supplies false information for the guidance of others in their business transactions, (3) another justifiably relies on the information, and (4) the person making the representation has failed to exercise reasonable care in obtaining or communicating the information."  *Valspar Refinish, Inc. v. Gaylord's, Inc*., 764 N.W.2d 359, 369 (Minn. 2009) (citation omitted).

Plaintiffs assert that Wells Fargo made several false representations with respect to a loan modification.  These alleged misrepresentations stem from the August 25, 2010 TPP Letter.  Specifically, Plaintiffs assert that Defendants offered and agreed in writing to modify Plaintiffs' loan, not to charge Plaintiffs any fees during trial payments, not to conduct a foreclosure sale, and to waive all unpaid late charges, if Plaintiffs made required trial payments.  (Verified Compl. ¶ 72.)

Here, Plaintiffs' negligent misrepresentation claim fails as a matter of law, as Plaintiffs have not pointed to evidence that Defendants made the alleged

misrepresentations.  As discussed above, the TPP Letter of August 2010 contains no promises to permanently modify Plaintiffs' loan if Plaintiffs made trial period payments. Instead, the TPP Letter was an offer to enter into a trial period plan.  Moreover, the TPP Letter explicitly provides that it does not constitute a loan modification, that Plaintiffs' loan requirements remained in effect and unchanged during the trial period, and that a permanent modification would be contingent upon Plaintiffs making timely payments and submitting required documentation for review.  Viewing the evidence in the light most favorable to Plaintiffs, there is no evidence that Defendants made any false representations.  As such, summary judgment on Plaintiffs' negligent misrepresentation claim is warranted.

### C.     Breach of Covenant of Good Faith and Fair Dealing (Count III)

Under Minnesota law, there is an implied duty of good faith and fair dealing in every contract.  *See In re Hennepin Cnty. 1986 Recycling Bond Litig*., 540 N.W.2d 494, 502 (Minn. 1995) (citation omitted).  Plaintiffs allege that Wells Fargo breached the implied covenant of good faith and fair dealing by not providing them with a loan modification.  (Verified Compl. ¶¶ 90-97.)

A cause of action for good faith and fair dealing cannot exist independent of the underlying breach of contract claim; instead, a contract must exist before a duty of good faith and fair dealing can be implied.  *See, e.g.*, *Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 670 (8th Cir. 2010) (citation omitted).  Here, the Court has already concluded that Plaintiffs' claim for breach of contract fails as a matter of law.  Plaintiffs

cannot demonstrate that a contract to modify the loan existed.  Accordingly, Plaintiffs'

breach of covenant of good faith and fair dealing claim also necessarily fails.

### D.      Promissory Estoppel (Count IV)

In Count IV, Plaintiffs assert a claim for promissory estoppel.  In support,

Plaintiffs allege that Defendants made a clear and definite promise that offered a

permanent modification of Plaintiffs' loan should certain conditions be met.  In

particular, Plaintiffs allege that Defendants made the "unequivocal promise . . . that:

Defendants were going to modify Plaintiffs' Loan."  (Verified Compl. ¶ 99.)

To prevail on a promissory estoppel cause of action, Plaintiffs must demonstrate

that:  (1) a clear and definite promise was made; (2) the promisor intended to induce

reliance and the promise was in fact relied on to his or her detriment; and (3) the promise

must be enforced to prevent injustice.  *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d

732, 746 (Minn. 2000).

Plaintiffs assert that the promises made were those made in the alleged TPP Letter.

Specifically, Plaintiffs assert that Defendants promised:  (1) to modify Plaintiffs' loan;

(2) that they would not charge Plaintiffs any fees during the trial payments; (3) that they

would not foreclose on Plaintiffs' Property; and (4) that they would waive all unpaid late

fees.  (Verified Compl. ¶ 99.)  As discussed above, Wells Fargo did not promise to

modify Plaintiffs' loan.  Nor does the TPP Letter constitute a unilateral offer regarding

the same.  Instead, Wells Fargo explained that participation in the TPP was a *first step*

towards a loan modification.  Moreover, the TPP Letter specifically provided that "any

pending foreclosure action or proceeding will not be dismissed and may be immediately

resumed if you fail to comply with the terms of the trial period plan **or do not qualify for a modification**" and "**if your loan is modified,** we will waive all unpaid late charges." (Banks' App. at 82, 84 (emphasis added).)  Because Plaintiffs have failed to put forth evidence of the alleged promises, the Court grants summary judgment on Plaintiffs' promissory estoppel claim.  *See, e.g.*, *Bonhoff*, 853 F. Supp. 2d at 857.

E.      **Slander of Credit (Count V)**

In Count V, Plaintiffs allege slander of credit, or credit defamation.  Plaintiffs allege that Defendants promised to modify Plaintiffs' loan, failed to honor the modification, and then negatively reported on Plaintiffs' credit, resulting in Plaintiffs' credit being slandered and causing damage to Plaintiffs.  (Verified Compl. ¶¶ 106-16.)

Plaintiffs' slander of credit claim fails for two reasons.  First, any such claim appears to be barred by the Fair Credit Reporting Act ("FRCA").  *See* 15 U.S.C. § 1681s-2.  In particular, the Court is persuaded by authority from other circuits holding that similar defamation claims are preempted when the claims arise out of duties as a furnisher under 15 U.S.C. § 1681s-2.  *See, e.g.*, *Macpherson v. JP Morgan Chase Bank, N.A.*, 665 F.3d 45, 47-48 (2d Cir. 2011); *Purcell v. Bank of Am.*, 659 F.3d 622, 624-25 (7th Cir. 2011).  Here, Plaintiffs' defamation claim arises out of Wells Fargo's duties as a furnisher under 15 U.S.C. § 1681s-2 and, thus, falls squarely within the preemption language of § 1681t(b)(1)(F) (preempting all state-law claims relating to "any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies").

Second, even if Plaintiffs' slander of title claim was not preempted, Plaintiffs have not pointed to evidence to support the claim. To prove a defamation claim, Plaintiffs must show: (1) a false statement; (2) communicated to someone besides Plaintiffs; and (3) that the statement tended to harm Plaintiffs' reputation. *See Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 25 (Minn. 1996) (citation omitted). Here, Plaintiffs have no evidence demonstrating that Defendants made any defamatory statements. Moreover, Plaintiffs have not pointed to any record evidence of credit reporting or any evidence that they are not able to secure new credit as a result of any alleged reporting. Without such evidence, Plaintiffs' claim fails as a matter of law.

### F. Violation of Minnesota Statutes §§ 580.02, 580.04, and Slander of Title (Counts VI, VII, and VIII)

In Counts VI and VII, respectively, Plaintiffs claim that Defendants violated Minnesota Statutes §§ 580.02 and 580.04 in attempting to foreclose on the Property prior to recording all assignments and without specifying all assignments and the notice of foreclosure. (Verified Compl. ¶¶ 117-137.) The Minnesota Statutes at issue require that in order to foreclose by advertisement, the mortgage, as well as any assignments, must be recorded and that each notice of foreclosure by advertisement must contain the name of the mortgager, the mortgages, and each assignee of the mortgage, if any. (*See* Minn. Stat. §§ 580.02(3)), 580.04(a)(1).) Plaintiffs base their claims under these Minnesota Statutes on the fact that Defendants' Notice of Mortgage Foreclosure listed only one assignee, The Bank of New York Mellon, yet Plaintiffs allege that the Mortgage was assigned at least three more times, on July 13, 2005, July 14, 2005, and October 8, 2012.

Here, the public record shows that the Mortgage was recorded and that it was assigned once on April 17, 2009, to the Bank of New York Mellon. (Bank's App. at 28-31.) In addition, the assignment was recorded on July 1, 2009. (*Id*.) The Notice of Mortgage Foreclosure Sale contains the name of the mortgagers, the mortgages, and the one assignment. (*Id*.) Thus, Defendants complied with the Minnesota Statutes and Plaintiffs' claims under those statutes fail as a matter of law.

The Court notes that Plaintiffs' argument that alleged subsequent assignments were required to be listed in the Notice of Foreclosure Sale is without merit. First, two of these assignments were assignments of Plaintiffs' *second* mortgage. (*Id*. at 146-53 (recorded copy of second mortgage); *see also id*. at 9-28; Haik Aff. ¶¶ 4, 6, Exs. 3, 5.) Thus, these assignments were not required to be listed. Second, the third alleged assignment, is blank and incomplete, naming no assignee. (Haik Aff. ¶5, Ex. 4.) This blank assignment is without effect.

In Count VIII, Plaintiffs assert a claim for Slander of Title. (Verified Compl. ¶¶ 138-146.) Plaintiffs' Slander of Title claim is premised on their claim for breach of contract and violations of Minn. Stat. §§ 580.02 and 580.04. In short, Plaintiffs assert that Wells Fargo did not have a right to foreclose because it promised to modify Plaintiffs' loan and because it failed to record all assignments of the mortgage. Thus, Plaintiffs claim that recording a Sheriff's certificate containing allegedly false statements was slanderous.

To prevail on a claim of Slander of Title, Plaintiff must demonstrate that: (1) there was a false statement concerning the real property owned by Plaintiffs; (2) the false

statement was published to others; (3) the false statement was published maliciously; and

(4) the publication of the false statement concerning title to the property caused damages.

*Paidar v. Hughes*, 615 N.W.2d 276, 279-80 (Minn. 2000).

Here, Plaintiffs' Slander of Title claim fails as a matter of law. First, as explained

above with respect to Plaintiffs' Breach of Contract claim, Plaintiffs cannot show that

Wells Fargo promised to modify Plaintiffs' mortgage loan. Second, as discussed above,

Plaintiffs' claims under Minn. Stat. §§ 580.02 and 580.04 fail as a matter of law. Finally,

Plaintiffs have not pointed to any evidence to demonstrate that Defendants acted with

malice. For these reasons, Plaintiffs' Slander of Title claim fails and summary judgment

is warranted.

## ORDER

1.     Plaintiffs' Motion to Enforce Settlement Agreement (Doc. No. [40]) is

**DENIED**.

2.     Defendants' Motion for Summary Judgment (Doc. No. [51]) is

**GRANTED**.

3.     This matter and all claims are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  August 5, 2015                          s/Donovan W. Frank
                                                DONOVAN W. FRANK
                                                United States District Judge